# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| DENNIS COVERSTONE, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|   v. | ) | CIVIL NO. 1:06cv92 |
| | ) | |
| MICHAEL J. ASTRUE,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
|     Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court[2] for judicial review of a final decision of the Defendant
Commissioner of Social Security ("Commissioner") denying Plaintiff Dennis Coverstone's
application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")
as provided for in the Social Security Act ("Act"). 42 U.S.C. §416(i); 42 U.S.C. §423; 42 U.S.C.
§§ 1382, 1382c(a)(3).  Coverstone filed his opening brief (Docket # 13) on October 16, 2006.
On January 3, 2006, the Commissioner filed a memorandum in support of its decision (Docket #
16), and on January 17, 2007, Coverstone filed his reply (Docket # 17).

Upon full review of the record in this cause, this Court is of the view that the ALJ's
decision should be AFFIRMED.

## I.  PROCEDURAL HISTORY

Coverstone filed his DIB and SSI applications on February 19, 2002, alleging disability
as of October 30, 2001. (Tr. 60-62.)  After his applications were denied initially and on

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security; therefore, Michael
J. Astrue is automatically substituted for Jo Anne B. Barnhart as the Defendant in this case. 42 U.S.C. § 405(g); Fed.
R. Civ. P. 25(d)(1).

[2] Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

reconsideration, he requested a hearing. (Tr. 32-34, 47-48, 51-55.)  On December 8,

2004, Coverstone, represented by counsel, appeared and testified before Administrative Law

Judge ("ALJ") Frederick McGrath.  Dr. Leonard Fisher, a vocational expert, appeared and

testified also. (Tr. 293-327.)  On August 26, 2005, the ALJ found that Coverstone was not

disabled because he retained the residual functional capacity ("RFC") to perform his past

relevant work. (Tr. 17-25.)  The Appeals Council denied review, leaving the ALJ's decision as

the final decision of the Commissioner. (Tr. 5-13, 290-92.)  Coverstone now seeks judicial

review pursuant to 42 U.S.C. § 405(g).

## II.  FACTUAL BACKGROUND

### A.  Background and Daily Activities

At the time of the hearing, Coverstone was 44 years old having been born on October 11,

1960. (Tr. 60.)  He had a high school education. (Tr. 71.)  He had worked as a parking lot

attendant, quality control manager, retail manager, and production supervisor. (Tr. 17, 66, 99.)

Coverstone alleges the following impairments: fibromyalgia, pain disorder associated with

psychological factors, pain disorder associated with a medical condition, Dysthymic Disorder,

and growth hormone deficiency.

At the administrative hearing on December 8, 2004, Coverstone testified that he stopped

working because of pain and because he experienced flu-like symptoms almost every day. (Tr.

298.)  The more pain he experienced, the more fatigued he felt. (Tr. 299.)  He had burning and

tingling pain in his feet, legs, arms, shoulders, back, and chest, accompanied by muscle spasms

and sharp stabbing pains. (Tr. 299.)  The pain in his feet was never less than 7 on a scale of 1-10;

the pain in his legs and chest was never less than 8/10; and the pain in his arms and shoulders

2

was always about 8/10 or 9/10. (Tr. 300-01.)  He had difficulty sleeping because of the pain and could only sleep 5-6 hours at a time. (Tr. 301-02.)  He also usually slept for 2-5 hours in the afternoon. (Tr. 303.)

Coverstone had tried various medications, but none of them helped him sleep. (Tr. 303.) Pain medications also had not helped, and he stopped taking most of them because of allergies. (Tr. 306.)  Aqua therapy relieved his pain while he was in the pool, but made him feel worse afterward. (Tr. 305.)  He had been given physical therapy exercises, but was unable to do them. (*Id*.)  A TENS unit only caused more pain. (Tr. 305.)  Hormone injections also made him feel worse. (Tr. 308.)  His fatigue was overwhelming and made him feel drained but not sleepy. (Tr. 306-07.)  Sometimes Coverstone just rested for hours and hours. (Tr. 308.)  He experienced flu-like symptoms every 2 weeks which lasted for 2-3 days. (Tr. 309.)

Coverstone stated that on a typical day he got up about 7:00 a.m., had some coffee, rested again, got up again, had breakfast, and rested again. (Tr. 309-10.)  He would rest for a few hours in the afternoon and spend the evening watching television and petting his cat. (Tr. 311-12.)  He used to be involved with a poetry society, but could no longer sit through a 2-hour meeting. (Tr. 314.)  He had bouts of depression about every 2 weeks, which lasted for a couple hours. (Tr. 316.)

### B.  Summary of the Medical Evidence

Coverstone saw Dr. Shashi K. Ahuga, a cardiologist, twice in September 2001 for complaints that he had pain for about 3 days in the left side of the chest, left side of the neck, and left arm. (Tr. 109.)  Testing was performed including a rest and stress echocardiogram, which was normal, and he was diagnosed with hyperlipidemia and non-cardiac chest pain. (Tr. 108.)

3

In September 2001, Coverstone saw Dr. David Pepple, complaining of extreme fatigue and nausea after having mowed the lawn, chest pain, and shortness of breath. (Tr. 213.) He told the doctor that these were the same symptoms he had when he had pericarditis in 1993 or 1994. (*Id.*) In October he complained of pain in the legs and muscles that was intermittent for 6 months and getting worse. (*Id.*) He also reported a burning sensation. (*Id.*) He was also waking at night. (*Id.*) In November he was in again for "exhausting" pain, and he reported that any use of his muscles hurts. (Tr. 212.) He complained of cramping and twitching of the muscles. (*Id.*) The symptoms had gotten much worse since October. (*Id.*) He was taking Lortabs. (*Id.*) The diagnosis was muscle and joint pain, and a consult was to be set up with Dr. Sriram. (*Id.*)

On November 1, 2001, Coverstone was in the emergency room at Parkview Hospital complaining of "severe body pain." (Tr. 124.) He described diffuse pain, particularly in his lower extremities. (*Id.*) The pain was described as sharp and burning. (*Id.*) The pain had been ongoing for 2-3 months. (*Id.*) He had undergone a number of tests through Dr. Pepple's office, but the results were all normal. (*Id.*) The pain was in the muscles as well as the joints. (*Id.*) He reported that every time he moved his joints, he heard his bones cracking. (*Id.*) He denied warmth and redness of the skin overlying the pain. (*Id.*) He also reported that he had been raped at the age of four and sodomized. (*Id.*) He reported that he had dealt with this through therapy. (*Id.*) On physical exam he was tearful with a flat affect, but he was able to maintain good eye contact. (Tr. 125.) He had diffuse pain to palpitation over the muscles. (*Id.*) He was given morphine sulfate. (*Id.*) The diagnosis was diffuse myalgias. (*Id.*) He was given Vicodin for pain. (Tr. 126.)

In November 2001, Coverstone was evaluated by Dr. Kenneth Smith, a rheumatologist,

4

for a one-year history of arthralgias and myalgias. (Tr. 130-31.)  Dr. Smith noted an extensive history of psychological problems, and he found that these could aggravate his arthralgias and myalgias. (*Id.*)  He also noted that Coverstone had been on Paxil for several years because of anxiety attacks and depression. (*Id.*)  On physical examination there was no musculoskeletal inflammation, but there were positive Tinel's signs bilaterally though Phalen's signs were negative. (*Id.*)  Strength testing was normal as were peripheral joints. (*Id.*)  The muscles were not tender. (*Id.*)  There was a moderate degree of hypothenar eminence erythema found. (*Id.*)  The only abnormalities on joint examination were those of mild patellofemoral crepitis through full movement. (*Id.*)  The back examination was essentially normal, as was the neurological examination. (*Id.*)  He also had an EMG and nerve conduction study performed, and the results were essentially normal. (*Id.*)  Dr. Smith recommended aerobic exercise 3 times a week such as walking, swimming, or bike riding. (*Id.*)  Dr. Smith reported that Coverstone would need ongoing treatment and therapeutic adjustment through Dr. Pepple's office. (Tr. 132.)

Coverstone visited Dr. Pepple again in December 2001, and he was prescribed Vicoprofen and Celebrex. (Tr. 211.)

Dr. Indra Sriram, an internal medicine specialist, reported in a letter of January 18, 2002, that Coverstone had fibromyalgia and had been referred to Dr. Smith. (Tr. 133.)

In January 2002, Coverstone saw Dr. Mark Reecer, a physical medicine and rehabilitation specialist, for complaints of severe generalized pain which was debilitating. (Tr. 134.)  He told Dr. Reecer that he had longstanding pain and recurring infection since childhood, and he admitted an abusive household when growing up. (*Id.*)  He described constant pain in his neck, shoulders, arms, back, hips, knees, legs, ankles, and feet. (*Id.*)  He complained of joint pain

greater than muscle pain, and he had cramping and spasm. (*Id.*)  He also reported constant tingling, and he stated that his "whole body" is constantly weak. (*Id.*)  He reported relief with lying on his side, back, or stomach with his legs elevated. (*Id.*)  He also complained of pain at night. (*Id.*)  The pain kept him from activities such as work, bicycling, gardening, volunteering, club activities, and "living life." (*Id.*)

On physical exam by Dr. Reecer, there was generalized tenderness with a palpitation over the upper trapezius and parascapular musculature as well as in the upper limbs. (*Id.*)  Coverstone had generalized tenderness with palpation over the lower lumbar paraspinals and hips, but his range of motion was surprisingly normal. (*Id.*)  Strength was good with some "giveway" in the lower limbs. (*Id.*)  His diagnosis was reported history of fibromyalgia, probable underlying psychosocial issues, and deconditioning. (*Id.*)  He recommended aqua therapy and then land based therapy, consultation with Dr. Fran Goff, and gradual increasing activity at home and at work. (*Id.*)

Coverstone was back in January 2002 to visit Dr. Pepple after having seen Dr. Reecer; Dr. Pepple had a copy of Dr. Reecer's report. (Tr. 210.)  Valium was helping him "not to care as much"; however, it did not help the pain. (*Id.*)  He reported that the pain makes him nauseated, but laying down relieved the nausea. (*Id.*)  He was trying to push himself to stay active, and on that day he had done laundry and vacuumed for an hour. (*Id.*)  He saw the doctor again in March. (Tr. 209.)  Aqua therapy had failed. (*Id.*)  He was using a shower treatment 3 times a day with hot water on his joints. (*Id.*)  His activity level was about 2 hours. (*Id.*)  The doctor noted that he was doing "so – so," but seemed a bit more functional. (*Id.*)  He also reported that he was using a fibromyalgia chat room to help relate to others with a similar problem. (*Id.*)

On April 9, 2002, a consultative psychological evaluation was conducted by Dr. Renee E. Vanhorn, a neuropsychologist. (Tr. 138-42.) She reported that Coverstone alleged disability due to fibromyalgia. (Tr. 138.) He reported that he had been abused as a child, which he finally recalled in 1997, and during that time he began having anxiety attacks and Paxil was started. (*Id*.) He had told her that he developed serious problems last summer when little things started to fatigue him, his pain increased, and he had no energy. (Tr. 139.) He said he had pain all over but it was worse in the shoulders, neck, hips, and legs. (*Id*.) He reported that his appetite was poor but that he had gained 10 pounds in the past 6 months. (*Id*.) He also reported that he had trouble falling and staying asleep due to the pain, but that his sleep had improved somewhat lately. (*Id*.) He did not have nightmares or flashbacks. (*Id*.)

On mental status exam Coverstone's affect and mood were normal, but he reported mild depression and anxiety. (*Id*.) He reported that he had a couple of close friends, but because of the pain and fatigue he did not socialize much away from home. (Tr. 140.) He reported that he was independent with personal care, including dressing, bathing, and grooming, but he reported that he was very slow to complete those activities due to pain and fatigue. (*Id*.) He also reported that he suddenly and unpredictably loses his grip or balance. (*Id*.) In regard to domestic chores, he reported he can do a little housework such as vacuuming and laundry. (*Id*.) Overall, he reported that his "down time" is frequent and non-productive. (*Id*.) Dr. Vanhorn's diagnosis was pain disorder associated with medical condition and rule out post traumatic stress disorder. (Tr. 141.) She assigned a Global Assessment of Function ("GAF") of 78. (*Id*.) Finally, she concluded that he was capable of some type of flexible work that is not too physically taxing, but his work pace

7

was slow and attention and concentration are relatively poor. (Tr. 142.)

Dr. Pepple completed a letter in May 2002 in which he opined that Coverstone was significantly impaired from fibromyalgia. (Tr. 205-06.)  He found that he had continuous pain and rigidity in all joints including hips, knees, and hands. (*Id.*)  Exercise made the problems worse, which limited his rehabilitation potential. (*Id.*)  He found that Coverstone could stand for only 15-20 minutes at a time and that he could only ride in a car for short distances. (*Id.*)  He also found that he could not climb, stoop, squat, lift, or carry secondary to pain. (*Id.*)  Dr. Pepple concluded that there was no occupation Coverstone could perform at that time or in the foreseeable future. (*Id.*)

On July 13, 2002, a consultative exam was performed by Dr. Nathan Foote. (Tr. 143-45.) Dr. Foote noted that Coverstone alleged disability due to fibromyalgia. (Tr. 143.)  He reported pain primarily in the legs, but also in the shoulders, hands, knees, calves, and arms. (*Id.*)  He also had chest pain in the summer of 2001. (*Id.*)  He reported occasional weakness. (*Id.*)  The doctor also noted that he tried aqua therapy and a TENS unit that did not help. (*Id.*)  On physical exam his gait was ataxic and wide based. (Tr. 144.)  He had abnormal station, and he held his arms out for balance. (*Id.*)  He walked without an assistive device. (*Id.*)  He was able to walk on heels and toes without difficulty, but he did have difficulty with the tandem walk. (*Id.*)  There was no difficulty with the squat and rise from a squatted position. (*Id.*)  His range of motion was normal. (*Id.*)  The neurological examination was normal. (*Id.*)  Dr. Foote concluded that Coverstone had limitations in his activities of daily living. (*Id.*)  He also noted that Coverstone said he could walk for 15 minutes, sit for 5-10 minutes, and stand for 5 minutes, and that he was unable to quantify the amount he could lift. (*Id.*)

In August 2002, Dr. F. Kladder, a state agency psychologist, found that although Coverstone did have a somatoform disorder, his impairment was not severe. (Tr. 146-73.)  Dr. Kladder concluded that Coverstone had mild psychologically-based limitations in his activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (Tr. 156, 170.)  Dr. K. Neville, another state agency psychologist, reviewed the evidence on March 28, 2003, and affirmed Dr. Kladder's opinion. (Tr. 160.)

In September 2002, Dr. B. Whitley, a state agency physician, completed a "Physical Residual Functional Capacity Assessment" based on a primary diagnosis of disorders of muscle, ligament, and fascia, and a secondary diagnosis of fibromyalgia. (Tr. 174-81.)  He found that Coverstone was capable of performing medium exertional work with non-exertional limitations of never climbing ladders, ropes, and scaffolds. (*Id.*)  Dr. Whitley also concluded that Coverstone was only partially credible because his allegations were out of proportion to the medical evidence of record. (Tr. 179.)  He also stated that Dr. Pepple's statement regarding the extent of Coverstone's limitations was not supported by the medical evidence of record. (Tr. 180.)  Dr. J. Sands, a second state agency physician, affirmed Dr. Whitley's conclusion in June 2003. (Tr. 181.)

Also, in September 2002, Coverstone was referred to Dr. Kadambi by Dr. Pepple (Tr. 208), and during the latter part of the year, Dr. Pepple continued to prescribe medications. (Tr. 207.)

On October 8, 2002, Coverstone saw Dr. John M. Rathbun, psychiatrist, at the request of an insurance company regarding Coverstone's claim for psychiatric disability. (Tr. 228.)  Coverstone scored a 37 on the psychiatrist's revision of the Goldberg Depression Scale, which

9

was indicative of mild to moderate major depression. (*Id*.)  The subjective complaints that were particularly elevated included psychomotor retardation, difficulty concentrating, anhedonia, ambivalence, fatigue, feeling that life is "too hard," sleep disturbance, feeling "stuck," and appetite disturbance. (Tr. 228-29.)  He reported that he had been employed at his job for 5 years, and he ran the quality control program which he loved. (*Id*.)

Coverstone also told Dr. Rathbun that he had been extremely active physically and socially, and he mentioned being a board member and chair of several committees. (*Id*.)  He was also an active member of the Northeast Indiana Poets Association, which involved doing poetry readings around town. (*Id*.)  He had also been involved in a lot of charity work raising money for various causes. (*Id*.)  He reported an early history of abuse within his family, which was of catastrophic intensity, started early, and was sustained for a long time. (*Id*.)  He had a number of physical symptoms to which he attributes his abuse including bladder infections and irritable bowel syndrome. (Tr. 230.)  He reported that he had largely treated himself for the problem, but he did see a local psychologist for several months which he felt helped him. (*Id*.)

Coverstone reported to Dr. Rathbun that his current problem began in February 2001 with pain in the legs all the time that affected his sleep, and then it moved into his arms, back, neck, and chest. (*Id*.)  By August he was concerned enough to see a doctor. (*Id*.)  In October he was having trouble completing his work schedule, and he had not worked since that month. (*Id*.)  He reported something was attacking his body, and he hurt all the time. (*Id*.)  He told Dr. Rathbun that he loses his balance and his grip. (*Id*.)  He also told the doctor that it was stressful to come to the interview. (*Id*.)  He told him that normally he cannot be up for more than a few hours at a time, and then he may need to rest anywhere from 30 minutes to 5 hours. (*Id*.)  He

says

eventually he was given a diagnosis of fibromyalgia. (*Id*.)  He tried aqua therapy, exercise,

TENS, and had an endocrine referral pending. (*Id*.)

Dr. Rathbun thought the diagnosis of fibromyalgia was appropriate. (*Id*.)  He noted that

the case was somewhat typical of people diagnosed with fibromyalgia in that there is a

substantial history of anxiety-induced physical symptoms. (*Id*.)  Dr. Rathbun also found that his

childhood history of catastrophic abuse was very typical of people who wind up with

psychogenic pain. (Tr. 230-31.)  Thus, he diagnosed him with Pain Disorder Associated with

Psychological Factors and rated his GAF at 41. (*Id*.)  He also noted that Coverstone seemed to

achieve a very high level of social integration prior to the onset of his disability, which is not

typical of malingerers. (*Id*.)  However, he thought he was receiving suboptimal treatment for his

condition. (*Id*.)  He suggested Amitryptline or Neurontin. (*Id*.)  He also recommended intensive

psychological support and a program of graded physical exercise particularly with a history of

catastrophic childhood abuse. (*Id*.)

Finally, Dr. Rathbun concluded that Coverstone lacked the ability to attend to any sort of

structured work duties for any more than 2 hours at a time and 2 hours is probably the

maximum that he could function in the workplace on any given day. (*Id*.)  However, he thought

there was potential for him to be rehabilitated substantially or completely through an aggressive

program of psychiatric treatment. (*Id*.)

On October 24, 2002, Coverstone saw Dr. Ashok Kadambi, an endocrinologist, for an

evaluation of his chronic fatigue. (Tr. 201.)  He told the doctor that his fatigue had become worse

since 2001 and that he had seen many consultants from various disciplines with marginal relief.

11

(*Id.*)  He related that his diagnosis was fibromyalgia. (*Id.*)  He rated his fatigue as a 9/10. (*Id.*)

Dr. Kadambi decided to investigate a variety of hormonal issues. (Tr. 203.)  He also decided to

make some changes in Coverstone's diet. (*Id.*)  Coverstone was seen again at the end of

November after testing had been completed, and Dr. Kadambi diagnosed hypogonadotropic

hypogonadism, malaise and fatigue, fibromyalgia, and growth hormone deficiency. (Tr. 196.)

On December 10, 2002, he tested him for suspected growth hormone deficiency. (Tr. 192.)

On January 7, 2003, Dr. Kadambi saw Coverstone, who rated his fatigue as a 7/10. (Tr.

187.)  Dr. Kadambi noted that dynamic testing had confirmed growth hormone deficiency, and

he discussed treatment with injections. (Tr. 188.)  Coverstone's hypogonadotropic

hypogonadism was being treated with androgel. (*Id.*)  On February 4, 2003, he was given

training for injections of growth hormone deficiency. (Tr. 183.)

In May 2003, Dr. Pepple completed a letter that was almost identical to his May 2002

letter. (Tr. 205-06.)

On March 11, 2003, Coverstone saw Dr. Sherwin Kepes for a consultative psychological

examination. (Tr. 217-20.)  He reported his diagnosis of fibromyalgia, and he stated that he has

a non-functioning pituitary gland which was diagnosed in January of the present year. (*Id.*)  He

reported symptoms in terms of acute pain, exhaustion, muscle spasms, joint aches, and general

nausea. (*Id.*)  When asked about the impact of the pituitary gland difficulty he told Dr. Kepes

that

he had zero growth hormones to repair himself. (*Id.*)  At the current time he was taking Ultrecet

and Zanaflex for pain and muscle spasms, and he was also taking Humatrope and Paxil. (*Id.*)

His

health insurance from his previous employer was to end in July. (*Id*.)  He reported that his father

physically, sexually, emotionally abused him when he was a child. (*Id*.)  He had counseling in

1996 because he began having memories of repressed sexual abuse and was exhibiting signs of

post traumatic stress disorder. (*Id*.)  He reported that currently he has just slight symptoms. (*Id*.)

In regard to his daily activities, Coverstone reported to Dr. Kepes that he goes to bed

between 9:00 and 3:00 a.m., depending upon whether the pain settles down. (*Id*.)  He gets up

anywhere from 8:30 to 11:00. (*Id*.)  Most of the time he can sleep through the night. (*Id*.)  He

told Dr. Kepes that he could not concentrate because of the pain so he lies down, and sometimes

he plays solitaire on a laptop. (*Id*.)  He spends time on eBay. (*Id*.)  He does no cleaning but he

will microwave food and eat it right away while he is able to. (*Id*.)  He was on a rather strict diet

and eats mostly fresh fruits and vegetables. (*Id*.)  He reported that he had friends who come and

visit because he does not travel very well. (*Id*.)

Dr. Kepes observed that Coverstone was in obvious discomfort, and Coverstone told him

that he was in pain. (*Id*.)  He presented with a somewhat flat affective display, but he did laugh

on occasion. (*Id*.)  When asked how he was feeling, he responded, "I'm in a lot of pain." (*Id*.)

He

said he felt depressed at times because his life had been taken away. (*Id*.)  He reported his

activities were pretty minimal because anything he attempts causes pain. (*Id*.)  Dr. Kepes also

found that Coverstone evidences some signs of depression that appear to be more specifically

related to the chronic pain and subsequent reduction in work and social activities. (*Id*.)  He found

that his description of his abuse in therapy suggests the presence of post traumatic stress disorder

that appeared to have been largely resolved. (*Id*.)  Dr. Kepes found that his current level of

13

functioning appeared to have deteriorated somewhat from the previous Mental Status

Examination, and he appeared to be more distressed emotionally. (*Id*.)  He was assigned a GAF

of 65 and a diagnosis of Dysthymic Disorder and Pain Disorder Associated with a General

Medical Condition, Joint. (*Id*.)

Coverstone was seen in Dr. Kadambi's office again in March of 2003 complaining of

some swelling in the hands and feeling tired. (Tr. 264-77.)  He rated his fatigue as 7/10. (*Id*.)  He

was seen again in April complaining of hurting all over; he again rated his fatigue as a 7/10. (Tr.

260.)

In a letter dated May 8, 2003, Dr. Kadambi reported that he was treating Coverstone for

Growth Hormone Deficiency. (Tr. 259.)  He reported that at the initial evaluation on October 24,

2002, it is necessary to evaluate several lab values in order to determine the cause of his severe

malaise and fatigue resulting from his fibromyalgia. (*Id*.)  He found that one of these hormone

levels was DHEA-S, which is responsible for production of several adrenal hormones necessary

for energy, and any deficiency could result in severe fatigue. (*Id*.)  He reported that it was

necessary to evaluate the hormone level to rule out DHEA deficiency, which would need

replacement with oral medications. (*Id*.)

Coverstone saw a physician again in June 2003 due to a bump on his sternum for the last

6 months. (Tr. 222.)  He also reported that he had quite a bit of depression, that he was having

"body memories" from childhood abuse, and that his fibromyalgia was flaring up. (*Id*.)  The

diagnosis was fibromyalgia and contact dermatitis. (*Id*.)

### C.  Summary of the Vocational Expert's Testimony

At the administrative hearing, vocational expert Dr. Fisher testified that Coverstone's

past work as a production supervisor was light and skilled. (Tr. 319.)  His work as a retail store manager and line supervisor was also light. (Tr. 320.)  In addition, the vocational expert testified that if a person of Coverstone's age, education, experience, and work history were limited to sedentary work, such a person could perform a significant number of skilled and unskilled jobs at

the sedentary level, including receptionist (2000 jobs regionally), information clerk (300 jobs regionally, cashier (600-800 jobs regionally), taper printed circuit layout (200 jobs regionally), food and beverage order clerk (200-300 jobs regionally), microfilm document preparer (200-300 jobs regionally), surveillance system monitor (200 jobs regionally), film touch-up inspector (200 jobs regionally), and escort vehicle driver (500 jobs regionally). (Tr. 322-23.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner

are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212

(7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp

of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. DISCUSSION

### A. The Law

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The agency

has promulgated regulations that set forth a five-step sequential process for analyzing disability

claims. 20 C.F.R. §§ 404.1520, 416.920; *see Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir.

1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals

for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant
> presently unemployed? (2) Is the claimant's impairment "severe"?
> (3) Does the impairment meet or exceed one of a list of specific
> impairments? (4) Is the claimant unable to perform his or her
> former occupation? (5) Is the claimant unable to perform any other
> work within the economy? An affirmative answer leads either to
> the next step or, on steps 3 and 5, to a finding that the claimant is
> disabled. A negative answer at any point, other than step 3, stops
> the inquiry and leads to a determination that the claimant is not
> disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162

n.2 (7th Cir. 1985); *accord Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

A claimant has the joint burdens of production and persuasion through at least step four,

where the individual's RFC is determined. 20 C.F.R. §§ 404.1545, 416.945; *Bowen*, 482 U.S. at

16

146 n.5.  At step five the Commissioner bears the burden of proving that there are jobs in the national economy that Coverstone can perform. *Herron v. Shalala*, 19 F.3d 329, 333 n.18 (7th Cir. 1994).

### B.  The ALJ's Decision

In the present matter, after consideration of the entire record, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's pain disorder is a "severe" impairment, based upon the requirements in the Regulations (20 CFR §§ 404.1520 and 416.920).

4. This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P , Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity:  light work with no climbing of ladders, ropes or scaffolds.

7. The claimant's past relevant work as a parking lot attendant, quality control manager, retail manager or production supervisor did not require the performance of work-related activities precluded by his functional capacity (20 CFR §§ 404.1565 and 416.695).

8. The claimant's medically determinable pain disorder does not prevent the claimant from performing his past relevant

17

> work or other work that exists in significant numbers in the
> national economy.
>
> 9.    The claimant is not under a "disability" as defined in the Social Security
>       Act, at any time through the date of the decision (20 CFR §§ 404.1520(f)
>       and 416.920(f)).

(Tr. 24.)

## C.  Analysis

Coverstone first argues that the ALJ improperly found that his fibromyalgia was not a

medically determinable impairment.  According to Coverstone, the ALJ found that he did not

have fibromyalgia because Dr. Smith, a rheumatologist, did not find the requisite tender points.

Coverstone argues that this opinion was contrary to the opinions of all doctors who gave a

medical opinion in the case.  Coverstone notes that other doctors listed fibromyalgia as a

secondary diagnosis, and that other doctors agreed with the diagnosis.  Coverstone contends that

if the ALJ thought that all of the findings were not present to show a medically determinable

impairment, he should have recontacted Dr. Smith as a treating physician under the regulations

to determine if he could provide these findings. *See* 20 CFR § 404.1512(e).

The Commissioner, however, states that according to the criteria established by the

American College of Rheumatology, which the ALJ cited (Tr. 22) and which the Social Security

Administration follows for purposes of assessing fibromyalgia, *see Social Security Ruling* 99-2p

at note 3, a diagnosis of fibromyalgia requires not only a history of widespread pain, but also

pain in a minimum of 11 of 18 specific tender points. Frederick Wolfe *et al.*, *The American

College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia*, 33 Arthritis &

Rheumatism 160, 170-17 & Table 8 (1990).  The Commissioner points out that there is not a

shred of evidence in the medical record indicating that any physician who has examined

18

Coverstone noted the presence of tender points.  Rather, as the ALJ recognized, some of the physicians who examined Coverstone, such as Dr. VanHorn and Dr. Rathbun, also indicated that Coverstone's pain could result from a pain disorder. (Tr. 19-20 (citing Tr. 141, 231).)

The Commissioner further contends that Coverstone does not and cannot show how the ALJ's result would have been different had the ALJ classified his impairment as fibromyalgia rather than a pain disorder.  Fibromyalgia is not *per se* disabling, and indeed courts have recognized that most people with fibromyalgia are capable of performing substantial gainful activity. *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998) (stating that "fibromyalgia is not always (indeed, not usually) disabling").  The ALJ acknowledged that Coverstone's pain disorder constituted a severe impairment, meaning that it imposed significant limitations on his ability to perform work-related activity. 20 C.F.R. §§ 404.1521, 416.921.  Nothing in the medical evidence, the Social Security regulations, or the ALJ's analysis suggests that a pain disorder is an inherently less serious impairment than fibromyalgia.

In determining disability, the issue is not how the claimant's pain is classified, but what he can still do despite his pain. 20 C.F.R. §§ 404.1545, 416.945.  Thus, the Commissioner argues that even if the ALJ should have accepted that Coverstone's pain was caused by fibromyalgia rather than a pain disorder – which the Commissioner does not concede – any error was harmless, because it would not have changed the result. *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (articulating that an error is harmless where it has no impact on the outcome). This Court agrees with the Commissioner that the ALJ properly found that Coverstone suffered from a pain disorder and that he did not meet the criteria for a diagnosis of fibromyalgia. Substantial evidence supports the ALJ's conclusion, and thus it will not be disturbed by this

Court.

Coverstone next argues that the ALJ improperly evaluated the opinion of Dr. Rathbun. Dr. Rathbun, a psychiatrist, found that Coverstone could only function for 2 hours in the workplace per day. (Tr. 231.)  The ALJ did not give this opinion great weight because he found that the doctor only saw him once and his opinion was based mainly on the allegations of Coverstone rather than on clinical findings. (Tr. 20.)  Coverstone points out that no psychologist or psychiatrist who evaluated him saw him more than once, and thus Dr. Rathbun saw him as much as any other psychologist or psychiatrist.  Coverstone also contends that Dr. Rathbun's opinion is supported by clinical findings and laboratory test results.  Dr. Rathbun administered the Goldberg Depression Scale and performed a clinical interview. (Tr. 228-31.)  Coverstone claims that the ALJ made no attempt to explain why these clinical and laboratory findings were inadequate.

However, the Commissioner points out that, as the ALJ noted (Tr. 19, 20, 21), Dr. VanHorn and Dr. Kepes both found that Coverstone had only mild psychological symptoms (Tr. 138-42, 217-20), while Dr. Rathbun found that he had serious symptoms that would prevent him from functioning more than 2 hours a day (Tr. 228-31).  The state agency psychologist who reviewed the evidence in March 2003 agreed that Coverstone had only mild psychological limitations. (Tr. 160.)  The Commissioner argues that it is the ALJ's duty to resolve conflicts in the evidence. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000), and that is what the ALJ did here.

Given seriously conflicting and approximately contemporaneous opinions, the Commissioner argues that the ALJ reasonably gave more weight to the opinions which were

consistent with one another, and less to the most inconsistent opinion.  He reasonably explained that Dr. Rathbun's opinion appeared to be based largely on Coverstone's subjective complaints, particularly since the only objective evidence that Dr. Rathburn cited indicated mild to moderate depression, rather than severe symptoms. (Tr. 20 (citing Tr. 228).)  This Court agrees with the Commissioner that, because substantial evidence supports the ALJ's opinion that Coverstone had only mild psychological impairments, it should be upheld.

Next, Coverstone argues that the ALJ improperly evaluated the medical opinion of Dr. Pepple.  The ALJ gave little weight to the opinion of Dr. Pepple because he found that Dr. Pepple did not provide any clinical or laboratory findings to support his opinion and because it was inconsistent with his examinations. (Tr. 20.)  Dr. Pepple wrote 2 identical letters stating that Coverstone could only stand for 15-20 minutes at a time and that there were no occupations that Coverstone could perform. (Tr. 205-06.)  Dr. Pepple refused to provide another opinion late in 2003 because Coverstone had stopped coming to his office. (Tr. 225.)

As the Commissioner points out, Coverstone glosses over the fact that the ALJ provided a thorough explanation for his rationale for discounting Dr. Pepple's letters.  That is, the ALJ explained that Dr. Pepple's office notes indicated that his treatment of Coverstone was largely limited to filling prescriptions and making referrals to other doctors. (Tr. 21.)  Coverstone argues that Dr. Pepple had available to him correspondence from a variety of specialists who did test him, but those reports generally related to Coverstone's diagnosis and not to his ability to perform work-related activities.  Additionally, Dr. Pepple's letters did not cite any of these reports or explain how they bolstered his opinion that Coverstone could not work.

Also, the ALJ noted that Dr. Pepple's opinion was inconsistent with other examinations

in the record, which showed that Coverstone had normal range of motion, strength, and coordination, among other factors. (Tr. 20, 21.)  Coverstone complains that the ALJ did not specify which examination contradicted Dr. Pepple's opinions, yet it is apparent from the opinion that the ALJ is referring to the examinations of Dr. Smith, the rheumatologist; Dr. Heckaman, the neurologist; and Dr. Foote, the consultative physician. (Tr. 19-20.)  Thus the Commissioner concludes that the ALJ found, based on the other medical evidence of record, that Coverstone could perform a reduced range of light work.

Again, there can be no doubt that substantial evidence supports the ALJ's decision to give little weight to Dr. Pepple's opinion.  Thus, the ALJ's opinion that Coverstone could perform a reduced range of light work is also supported by substantial evidence.

Lastly, Coverstone argues that the ALJ improperly evaluated his symptom testimony. The ALJ discredited Coverstone's testimony because his description of limitations exceeds medical substantiation and was not consistent with other evidence. (Tr. 22.)  Coverstone contends that the ALJ erred because he failed to evaluate the impact of Coverstone's psychiatric problems on his underlying disabilities. *Gentle v. Barnhart*, 430 F.3d 865, 868-69 (7th Cir. 2005); *Mendez v. Barnhart*, 349 F.3d 360, 363 (7th Cir. 2006).

Coverstone points out that Dr. Rathbun found that his childhood history of catastrophic abuse was very typical of people who wind up with psychogenic pain. (Tr. 230-31.)  Dr. Rathbun also diagnosed Coverstone with a Pain Disorder Associated with Psychological Factors, which means that psychological factors play a major role in the onset, severity, exacerbation, or maintenance of the pain.  Dr. Reecer also found that there were also probably underlying psychosocial issues. (Tr. 134.)  Dr. Smith found that Coverstone's history of psychological

problems could aggravate his arthralgias and myalgias. (Tr. 130.)  Dr. Pepple's clinical notes

record a fibromyalgia flare-up in conjunction with depression problems. (Tr. 222.)  Coverstone

claims that although the ALJ discussed his mental impairments, he did not consider their impact

in combination with his physical problems.  Thus, Coverstone concludes that the ALJ committed

legal error.

The Commissioner, however, maintains that the ALJ reasonably found that Coverstone's

allegations regarding the extent of his limitations were not totally credible.  The Commissioner

agrees that under the Social Security Regulations, the ALJ must support his credibility finding

with reasons that are supported by the evidence in the administrative record and sufficiently

specific to make clear how the ALJ weighed the evidence. Social Security Ruling (SSR) 96-

7p(5), 1996 WL 374186 (S.S.A. 1996); *Shramek*, 226 F.3d at 811.  However, as long as the

ALJ's determination of credibility is grounded in the record and he articulates his analysis of the

evidence "at some minimal level, creating a logical bridge between the evidence and the result,

his decision must be upheld unless it is 'patently wrong.'" *Orlando v. Heckler*, 776 F.3d 209,

213 (7th Cir. 1985); *see also Shramek*, 226 F.2d at 881; *Powers v. Apfel*, 207 F.3d 431, 435 (7th

Cir. 2000).

The Commissioner claims that Coverstone's argument with respect to credibility amounts

to little more than an attempt to rework his argument that the ALJ should have given greater

weight to the opinions of Dr. Rathbun and Dr. Pepple.  The Commissioner reiterates that the ALJ

properly discounted the opinions of Drs. Rathbun and Pepple, in part because they were based on

Coverstone's subjective allegations rather than objective evidence in the record.

Additionally, the ALJ noted that Coverstone's account of his activities of daily living was

23

inconsistent with his allegations regarding the extent of his impairments, and that he made other allegations for which there was no evidence in the medical record, such as the alleged recurrence of flu-like symptoms every 2-3 weeks. (Tr. 22.)  The Commissioner contends that such inconsistencies may properly support a conclusion that a claimant's testimony is not entirely credible. *See Walker v. Bowen*, 834 F.2d 635, 641-42 (7th Cir. 1987) (finding that inconsistent statements may constitute substantial evidence underlying an ALJ's credibility findings); *Powers*, 207 F.3d at 435-36 (articulating that discrepancies between degree of limitation attested to by claimant and that suggested by the medical evidence is probative of exaggeration).

The Commissioner further notes that the state agency reviewing physicians, who are experts in evaluating social security disability cases, *see* 20 C.F.R. §§ 404.1527(e), 416.927(e), also expressly concluded that Coverstone's description of his limitations was not entirely credible because it was inconsistent with the medical evidence of record. (Tr. 179.)

Clearly, the ALJ has sustained his burden of articulating "a logical bridge between the evidence and the result." *Orlando*, 776 F.3d at 213.  The ALJ made clear that he discounted the psychological evidence due to a lack of objective evidence supporting Coverstone's claimed psychological problems.  Thus, it logically follows that the psychological evidence would not bolster Coverstone's claims of medical problems, which claims were riddled with inconsistent statements and allegations.  Coverstone is trying to use weak evidence to support weak evidence, hoping that the combination will equal stronger evidence.  Coverstone's attempt, however, is unavailing as substantial evidence supports the ALJ's decision with respect to both the psychological evidence and the medical evidence, and thus the ALJ's overall decision must stand.  Accordingly, the decision of the ALJ will be affirmed.

24

## V.  CONCLUSION

Based on the foregoing, the ALJ's decision is hereby AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Coverstone.  SO ORDERED.

Entered: March 22, 2007.

s/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge
